FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN EDWARD
CRITTENDEN,
    *Petitioner-Appellee*,

v.

KEVIN CHAPPELL,
Warden,
    *Respondent-Appellant*.

No. 13-17327

D.C. Nos.
2:97-cv-00602-KJM-GGH
2:95-cv-01957-KJM-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted
December 16, 2014—Pasadena, California

Filed October 26, 2015

Before:  M. Margaret McKeown, Raymond C. Fisher
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge McKeown

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's judgment granting California state prisoner Steven Crittenden's habeas corpus petition challenging his conviction and death sentence for two murders in a case in which Crittenden, who is African-American, argued that the prosecutor excluded an African-American prospective juror on account of her race in violation of the Equal Protection Clause of the Fourteenth Amendment, as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986).

The district court found the prosecutor was substantially motivated by race, and granted the petition, after this court remanded in light of *Cook v. LaMarque*, 593 F.3d 810 (9th Cir. 2010), which clarified that a peremptory challenge violates the Equal Protection Clause if it is motivated in substantial part by race regardless of whether the strike would have issued if race had played no role.

The panel rejected the state's contention that *Teague v. Lane*, 489 U.S. 288 (1989), prohibits the retroactive application of the standard articulated in *Cook*. The panel explained that *Cook* merely clarified the standard of proof for *Batson* claims; it did not set forth a new rule for purposes of *Teague*.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reaffirmed that the California Supreme Court's decision is not owed deference under AEDPA, because it was contrary to clearly established federal law, and the presumption of correctness afforded to the state trial court's factual findings is rebutted by clear and convincing evidence.

The panel held that the district court was not required to conduct its own evidentiary hearing, because it did not reject the magistrate judge's credibility determination.

The panel held that the district court's finding that the prosecutor was substantially motivated by race was not clearly erroneous.

Judge McKeown dissented. She joined the majority as to the *Teague* analysis and as to lack of deference to the California Supreme Court. She parted ways with the majority's ultimate conclusion that the prosecutor's challenge to the single black juror was substantially motivated by race. She would have deferred to the State trial court's fact-bound determination at *Batson* step one. She also would have applied de novo review to the district court's determination at *Batson* step three because the panel shared the district court's task of reviewing a cold record.

**COUNSEL**

Kamala D. Harris, Attorney General of California; Michael P. Farrell, Senior Assistant Attorney General; Stephanie A. Mitchell, Deputy Attorney General, Eric Christoffersen (argued), Supervising Deputy Attorney General, Sacramento, California, for Respondent-Appellant.

Mark Goldrosen (argued), Law Office of Mark Goldrosen, San Francisco, California; Michael L. Spiegel (argued), Law Office of Michael Spiegel, New York, New York, for Petitioner-Appellee.

**OPINION**

FISHER, Circuit Judge:

In 1989, a California jury convicted Steven Crittenden of two murders and sentenced him to death. Crittenden, who is African-American, filed a federal habeas petition, arguing the prosecutor excluded an African-American prospective juror on account of her race, in violation of the Equal Protection Clause of the Fourteenth Amendment, as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court initially denied Crittenden's petition. The court found, although race played a significant part in the peremptory challenge, the prosecutor would have made the challenge even if race had played no role, because of the prospective juror's opposition to the death penalty. We remanded in light of *Cook v. LaMarque*, 593 F.3d 810 (9th Cir. 2010), which clarified that a peremptory challenge violates the Equal Protection Clause if it is "motivated in *substantial* part" by race, *id.* at 815, "regardless of whether the strike would have

issued if race had played no role." *Crittenden v. Ayers*, 624 F.3d 943, 958–59 (9th Cir. 2010) (*Crittenden I*) (emphasis added).[1] On remand, the district court found the prosecutor was substantially motivated by race, and granted Crittenden's petition.

The state presents several challenges on appeal: (1) under *Teague v. Lane*, 489 U.S. 288 (1989), the district court was prohibited from retroactively applying the standard articulated in *Cook*; (2) the district court failed to apply deference to decisions by the California Supreme Court and the state trial court, as required under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA); (3) the district court improperly rejected the magistrate judge's credibility determination without conducting its own evidentiary hearing; and (4) the district court clearly erred by finding the prosecutor was substantially motivated by race.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm. First, *Cook* merely clarified the standard of proof for *Batson* claims; it did not set forth a new rule for purposes of *Teague*. Second, as we held in *Crittenden I*, the California Supreme Court's decision is not owed deference under AEDPA, because it was contrary to clearly established federal law, and the presumption of correctness afforded to the state trial court's factual findings is rebutted by clear and convincing evidence. Third, the district court was not required to conduct its own evidentiary hearing, because it

---

[1] We noted in *Crittenden I* that "the Supreme Court and this court have used the words 'significant' and 'substantial' interchangeably in analogous contexts," but we did not assume the district court's finding of "significant" bias necessarily was sufficient under *Cook*. 624 F.3d at 959 n.6.

did not reject the magistrate judge's credibility determination. Finally, the district court's finding that the prosecutor was substantially motivated by race was not clearly erroneous.

The Supreme Court has eloquently explained a jury selected without regard to race is a critical constitutional right:

> The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendant's culpability. Active discrimination by a prosecutor during this process condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law.

*Powers v. Ohio*, 499 U.S. 400, 411–12 (1991) (citations and internal quotation marks omitted). Accordingly, it is well established that a *Batson* violation is structural error. *See Williams v. Woodford*, 396 F.3d 1059, 1069 (9th Cir. 2005).

Given the district court's careful analysis of the record and its consequent findings, Crittenden is entitled under *Batson* to a new trial before a properly selected jury. The

district court's judgment granting Crittenden's habeas petition is affirmed.

## BACKGROUND

Jury selection in the state trial court took place between November 1988 and February 1989.[2] Initially, a pool of over 60 prospective jurors completed questionnaires asking them about their backgrounds and beliefs. Question 56 asked about their feelings regarding the death penalty. Manzanita Casey was the only African-American prospective juror. In answer to question 56, she wrote, "I don't like to see anyone put to death." She also wrote that she could set aside her personal feelings regarding what the law should be and follow the law as the court explained it.

After filling out the questionnaires, the prospective jurors appeared one-by-one for voir dire. During her voir dire, Casey reiterated her opposition to the death penalty. She also said, however, that her opposition would not prohibit her from voting for a first-degree murder conviction or the death penalty. At the conclusion of Casey's voir dire, the prosecutor challenged her for cause, "based upon her answer that she doesn't believe in the death penalty." The court denied the for-cause challenge.

After each prospective juror completed voir dire and passed for-cause challenges, the prosecutor wrote a rating on his copy of that juror's questionnaire. He gave favorable jurors one to four "✓s," four being the most favorable, and gave unfavorable jurors one to four "X"s, four being the most

---

[2] A detailed account of the crime and the evidence underlying the conviction and sentence is set out in *Crittenden I. See* 624 F.3d at 948–49.

unfavorable. The prosecutor rated Casey XXXX, the most unfavorable rating possible, and a rating he gave to only one other prospective juror of the over 50 who went through voir dire. The prosecutor later testified that, although he did not remember the basis for individual ratings, his general practice was to rate prospective jurors primarily based on their position regarding the death penalty – "Xs were . . . I would say, to a person, you were opposed to the death penalty and strongly stated it. . . . Checkmarks were people who either were for the death penalty or medium ground that I thought to some degree I would be able to tolerate having on the jury." He testified he also considered "people's backgrounds, whether they're employed, homeowners, what they had to lose. I wanted people who had something to lose in society, who might be victims of crime, solid citizens, preferably well educated."

A pool of over 40 prospective jurors who had gone through voir dire – including Casey – returned in February 1989 for the exercise of peremptory challenges. The court seated an initial group of 12 jurors. The prosecution and defense were allowed 26 peremptory challenges each. When a prospective juror was challenged, the court would seat another prospective juror who had gone through voir dire. The prosecutor based his challenges primarily on his ratings. He challenged all jurors who received one or more Xs.

Casey was seated after the prosecution's 13th challenge. The prosecutor used his 14th challenge against a juror who had received one ✓. He then used his 15th challenge against Casey. At the time Casey was challenged, only one other seated juror had received an unfavorable rating (*i.e.*, one or more Xs). After Casey was challenged, Crittenden immediately moved for a mistrial under *People v. Wheeler*,

583 P.2d 748 (Cal. 1978), arguing the peremptory challenge was motivated by race. *Wheeler* is the California procedural equivalent of *Batson*, and serves as an implicit *Batson* objection for purposes of preserving a *Batson* claim. *See Crittenden I*, 624 F.3d at 951 n.2. A *Batson/Wheeler* claim has three steps: "first, 'the defendant must make a prima facie showing that a challenge was based on race;' second, the prosecution must offer a race-neutral basis for the challenge; and third, the court must determine whether the defendant has shown 'purposeful discrimination.'" *Cook*, 593 F.3d at 814 (quoting *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009)).

In moving for a mistrial, Crittenden argued he had made a prima facie showing because: (1) Casey was the only African-American prospective juror; (2) she was a "solid member of the . . . community in terms of age, family composition, employment, length of residence, and so forth"; (3) the prosecutor examined her "at greater length[] than he'[d] examined other jurors"; and (4) in a different capital case a year earlier, the same prosecutor struck the only African-American prospective juror because he "was the President [of] the Student Law Union of Minorities," which indicated to the prosecutor that the individual was "active in law problems involving minorities" and had "sympathy for minorities."

The trial court denied the motion, finding Crittenden had not made a prima facie showing that the challenge was based on race. The trial court said it "would have expected a peremptory challenge" against Casey because she had expressed opposition to the death penalty and "couldn't decide whether or not she would be able to follow the law." Because the trial court denied the motion at step one of the

*Batson/Wheeler* test, it did not request an explanation for the challenge from the prosecution at step two. Ultimately 12 jurors were selected, each of whom had received one or more ✓s.

The California Supreme Court affirmed Crittenden's subsequent conviction and sentence on direct review in 1994. *See People v. Crittenden*, 885 P.2d 887 (Cal. 1994). It affirmed the trial court's finding that Crittenden had failed to make a prima facie showing, holding:

> Casey's apparent opposition to, uncertainty about, and repeatedly contradictory responses pertaining to the death penalty, her indication she might be unable to apply the law in that regard, her apparent general apprehension at serving on a jury for the first time, as well as her concern over her transportation to the court for trial, indicate there were legitimate, race-neutral grounds upon which the prosecutor reasonably might have challenged her.

*Id*. at 904.

Between 1994 and 2000, Crittenden filed multiple state and federal habeas petitions. The California Supreme Court dismissed his state habeas petitions in 1994 and 1999. The federal habeas petition was referred to a magistrate judge, who conducted an evidentiary hearing in 2002. At the hearing, the state produced through discovery new evidence not considered by the state courts – specifically, the prosecutor's rating of each potential juror after the voir dire. The prosecutor also described his general practice of rating

jurors, and testified that generally he "would try to get people who were threes and fours with checkmarks, to sit on the jury." He testified the jury selection "took place over a long period of time," and the ratings reflected his "gut feeling at the time that I spoke with jurors and was present when they were examined. And it was at that time that I made a decision."

In 2005, the district court denied Crittenden's federal habeas petition. The district court disagreed with the state trial court and the California Supreme Court, finding that, although their step one finding was presumed correct, Crittenden had rebutted the presumption and made a prima facie showing that the challenge was based on race. The district court based that finding on several facts, including: (1) a comparative juror analysis; (2) the prosecutor used "charged" terms when questioning Casey; (3) Casey was the only prospective juror the prosecutor challenged for cause based on general objections to the death penalty, and it was well established that such objections did not warrant a for-cause challenge; and (4) the prosecutor challenged the sole African-American prospective juror in the previous capital case. The court, therefore, proceeded to step two of the *Batson* inquiry and found the state met its burden to proffer a race-neutral justification for the challenge – Casey's opposition to the death penalty.[3] The court then proceeded to step three, and found Crittenden had not proven purposeful discrimination. Although the court found that "race played a

---

[3] Because the prosecutor could not remember why he challenged Casey, the state reconstructed from the record "what the prosecutor would have said had he been asked his reason for exercising the peremptory challenge," relying on *Johnson v. Love*, 40 F.3d 658, 667 (3d Cir. 1994), and *United States v. Nicholson*, 885 F.2d 481, 482–83 (8th Cir. 1989).

significant part" in the peremptory challenge, and race-neutral factors could not "justify Casey's XXXX rating, especially when compared to other venire members," the court concluded the prosecutor "would have made the challenge in the absence of the improper motivation" because of Casey's opposition to the death penalty. Crittenden appealed.

On appeal, we held the California Supreme Court's decision with respect to Crittenden's *Batson* claim was not entitled to deference under AEDPA because, contrary to clearly established federal law, at step one it "required Crittenden to show a 'strong likelihood' that the prosecutor's challenge had been racially motivated." *Crittenden I*, 624 F.3d at 954. We affirmed the district court's determinations at *Batson* step one and step two that Crittenden had made a prima facie showing and the state had articulated a race-neutral justification for the challenge. *See id.* at 956–58.

At *Batson* step three, we declined to determine whether Crittenden had proven the challenge was based on race, because the district court had decided the question prior to *Cook*, which clarified that "the proper analysis . . . is whether the peremptory strike was 'motivated in substantial part' by race . . . regardless of whether the strike would have issued if race had played no role." *Id*. at 958 (quoting *Cook*, 593 F.3d at 815). Because the district court "was operating under the erroneous impression" that it could apply so-called "mixed-motives" analysis, such that the presence of a race-neutral, but-for cause for the challenge would defeat a *Batson* claim, we remanded "to give the court an opportunity to apply the proper standard, as articulated in *Cook*." *Id*. at 958–59.

On remand, the case again was referred to the magistrate judge, who issued new factual findings in light of both the district court's previous factual determinations in *Crittenden I* and other undisputed facts in the record. The magistrate judge recommended the *Batson* claim be denied because "the bias shown by the prosecutor . . . although significant, was not substantial in terms of the prosecutor's motivation." Reviewing those findings de novo, the district court disagreed with the magistrate judge's ultimate recommendation and instead found the prosecutor was substantially motivated by race for four reasons. First, the prosecutor rated Casey far more negatively than comparable white jurors. Second, Casey was the only prospective juror the prosecutor challenged for cause based on a general objection to the death penalty, and it was well established that such objections did not warrant a for-cause challenge. Third, the prosecutor asked Casey a provocative question regarding the death penalty, and twice used the charged term "gas chamber," whereas "no other juror was questioned in this manner with use of the same charged term." Fourth, "even if it is not given great weight, [the prosecutor's] strike of another black juror in a prior trial suggests that he took account of race in assessing how a juror would vote." The court granted Crittenden's petition. The state appeals.

## STANDARD OF REVIEW

We review de novo a district court's grant of habeas corpus relief. *See Gallego v. McDaniel*, 124 F.3d 1065, 1069 (9th Cir. 1997). A district court's factual findings in granting a habeas petition are reviewed for clear error. *See* Fed. R. Civ. P. 52(a)(6); *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). At *Batson*'s first step, whether the defendant has made a prima facie showing is a mixed question of law and

fact accorded a presumption of correctness in the habeas context. *See Tolbert v. Page*, 182 F.3d 677, 681 n.6, 685 (9th Cir. 1999) (en banc) (applying 28 U.S.C. § 2254(e)(1)). At *Batson*'s third step, it is "settled in this circuit" that "[w]hether the defendant has satisfied the ultimate burden of proving purposeful discrimination is, of course, a question of fact reviewed for clear error." *Id*. at 680 n.5.

Notwithstanding this authority, the dissent argues we should review de novo the district court's factual finding at *Batson* step three because the district court relied solely on a cold record, rather than testimony before the district judge. That argument is squarely foreclosed by Federal Rule of Civil Procedure 52(a)(6), which says, "[f]indings of fact, whether based on oral *or other evidence*, must not be set aside unless clearly erroneous." (emphasis added). "[I]t is impossible to trace the [dissent's] theory[] . . . back to the text of Rule 52(a)," which applies "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). The rationale for deference "is not limited to the superiority of the trial judge's position to make determinations of credibility," but also reflects that "[d]uplication of the trial judge's efforts . . . would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of  judicial resources." *Id*. at 574–75; *see* Fed. R. Civ. P. 52(a)(6) advisory committee's notes (1985 amendment) (explaining that permitting de novo review of findings based on documentary evidence would "tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some

factual issues, and needlessly reallocate judicial authority").**[4]** Accordingly, we properly review for clear error the district court's finding of purposeful discrimination at *Batson* step three.

## DISCUSSION

### I. *Teague* does not prohibit the retroactive application of the standard for *Batson* claims articulated in *Cook*

The state argues *Teague v. Lane*, 489 U.S. 288 (1989), prohibits the retroactive application of the standard for *Batson* claims articulated in *Cook*. "*Teague* held that federal habeas corpus petitioners cannot rely on new constitutional rules of criminal procedure that took effect *after* their convictions became final." *Boyd v. Newland*, 467 F.3d 1139, 1145 (9th Cir. 2004), *as amended on denial of reh'g* (Oct. 26,

---

**[4]** The dissent contends Rule 52(a)(6) does not apply here because the district court made few true factual findings. That is belied by the district court's 11-page review of the magistrate judge's factual findings on remand and de novo review of the record. Those findings, which underpinned the district court's ultimate factual conclusion at *Batson* step three, are hardly insignificant. In any event, we are bound by Rule 52(a)(6). As *Anderson* makes clear, "Rule 52(a) 'does not make exceptions or purport to exclude certain categories of factual findings from the obligation . . . to accept a district court's findings unless clearly erroneous.'" 470 U.S. at 574 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982)). The dissent's sole authority, *Holder v. Welborn*, 60 F.3d 383, 388 (7th Cir. 1995), cites no authority and does not even mention Rule 52(a)(6) or *Anderson.* It is therefore neither binding on us nor persuasive. *See Anderson*, 470 U.S. at 573 ("In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969))).

2006).  It is undisputed that Crittenden's conviction became final several years before *Cook*, and that the relief requested does not "fall[] within one of two exceptions to nonretroactivity on habeas review." *Leavitt v. Arave*, 383 F.3d 809, 816 (9th Cir. 2004).  The question, then, is whether *Cook* announced a new rule for purposes of *Teague*. We hold it did not.

"In general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301.  "To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.*

Here, our holding that *Cook* did not announce a new rule follows from *Boyd*, which rejected a *Teague* challenge under analogous circumstances.  *Boyd* held the Supreme Court's decision in *Johnson v. California*, 545 U.S. 162 (2005), did not establish a new rule for purposes of *Teague*. *See* 467 F.3d at 1146.  Like *Cook*, *Johnson* clarified the standard for *Batson* claims.  *Johnson* rejected the California Supreme Court's holding that, to establish a prima facie case of discrimination at step one, a defendant must show it is more likely than not that a challenge was based on race.  *See* 545 U.S. at 168. Instead, *Johnson* held, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* at 170.

*Boyd* held *Johnson* "merely clarif[ied]," or "explain[ed]" *Batson*.  467 F.3d at 1146.  The same is true of *Cook*. Whereas *Johnson* clarified the standard at *Batson* step one, *Cook* clarified the standard at *Batson* step three.  Further,

*Boyd* recognized *Johnson* was "an example of the Supreme Court's consistent interpretation of *Batson* to date." *Id*. Like *Johnson*, *Cook*'s clarification of *Batson*'s standard is consistent with existing precedent, as neither the Supreme Court nor this circuit had previously adopted mixed motives analysis. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008); *Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. 2006) (en banc). Thus, like *Johnson*, *Cook* neither "breaks new ground [n]or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301.

This conclusion also is consistent with *Tanner v. McDaniel*, 493 F.3d 1135 (9th Cir. 2007). *Tanner* held the Supreme Court's decision in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), did not establish a new rule for purposes of *Teague*. *See* 493 F.3d at 1142–44. *Flores-Ortega* held, in relevant part, that "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. *Flores-Ortega* held breach of this duty constituted ineffective assistance of counsel under the Sixth Amendment.

*Tanner* concluded this holding in *Flores-Ortega* was not a new rule, but merely an "application of" the "circumstance-specific reasonableness inquiry" dictated by *Strickland v. Washington*, 466 U.S. 668 (1984). *Tanner*, 493 F.3d at 1143. *Tanner* observed that "the general nature of the *Strickland* standard requires courts to elaborate upon what an 'objective standard of reasonableness' means for attorney performance in innumerable factual contexts," and "[e]ach time that a

court delineates what 'reasonably effective assistance' requires of defense attorneys with respect to a particular aspect of client representation, it can hardly be thought to have created a new principle of constitutional law." *Id* at 1143–44. (citations omitted). Similarly here, the general nature of the *Batson* standard requires courts to elaborate upon what constitutes "purposeful discrimination," and *Cook*'s explanation that "purposeful discrimination" may exist even when there is also a race-neutral, but-for cause of a prosecutor's decision to challenge a juror did not create a new principle of constitutional law. *See Wright v. West*, 505 U.S. 277, 309 (1992) (Kennedy, J. concurring) ("Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent."). Therefore, we hold *Teague* did not prohibit the district court from applying the standard articulated in *Cook*.

## II. The district court was not required to apply AEDPA deference to the California Supreme Court's decision or the state trial court's findings

### A. *The California Supreme Court's decision was not entitled to AEDPA deference because it was contrary to clearly established law*

The state next argues the district court failed to afford the necessary deference under AEDPA to the California Supreme Court's decision rejecting Crittenden's *Batson* claim on direct review. In *Crittenden I*, we held the California Supreme Court's decision was not entitled to AEDPA deference because, contrary to clearly established federal law, "it required Crittenden to show a 'strong likelihood' that the

prosecutor's challenge had been racially motivated" in order to establish a prima facie case. *Crittenden I*, 624 F.3d at 954. That holding is the law of the case. *See Hanna Boys Ctr. v. Miller*, 853 F.2d 682, 686 (9th Cir. 1988). We have discretion to reconsider our prior decision when "intervening controlling authority makes reconsideration appropriate" or "the decision is clearly erroneous and its enforcement would work a manifest injustice." *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc) (footnote omitted), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc). Neither circumstance exists here.

The state contends two cases decided after *Crittenden I* – *Harrington v. Richter*, 562 U.S. 86 (2011), and *Johnson v. Williams*, 133 S. Ct. 1088 (2013) – establish a presumption that the California Supreme Court applied the correct federal standard. Neither case stands for that proposition. *Richter* held, "when a state court issues an order that summarily rejects without discussion *all* the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." *Williams*, 133 S. Ct. at 1091 (discussing *Richter*). *Williams* extended that presumption to cases in which a state court addresses "some issues but does not expressly address the federal claim in question." *Id*. Neither *Richter* nor *Williams* addressed whether, when a state court does address a federal claim on the merits, it should be presumed to have applied the correct federal legal standard. Thus, neither provides a basis to reconsider our prior holding.

In any event, any such presumption would not aid the state here. At the time it decided this case, the California

Supreme Court had erroneously concluded the "terms 'strong likelihood' and 'reasonable inference' state the same standard." *Johnson*, 545 U.S. at 166. As we held in *Crittenden I*, the California Supreme Court relied on that erroneous conclusion when deciding Crittenden's appeal, conflating the two standards in its decision. *See* 624 F.3d at 952 (citing *People v. Crittenden*, 885 P.2d at 902).

The state also contends our holding is inconsistent with our earlier decision in *Boyd*. We disagree. In *Boyd*, although the state court first applied the "strong likelihood" standard for a prima facie case of discrimination recognized by the California Supreme Court, the state court "also held that Petitioner 'clearly did not establish a prima facie case of group discrimination, *even under federal precedent.*'" 467 F.3d at 1144 (emphasis added). Because the state court "recognized the difference between the two standards," and held the petitioner had "failed to establish a prima facie case under *either* state *or* federal law," *Boyd* held the court's "determination deserves deference." *Id*.

Here, in contrast, the California Supreme Court did not separately address the federal standard. It cited and discussed only the erroneous "strong likelihood" standard, and incorporated its discussion of the facts under that standard as the basis for its denial of the *Batson* claim. *See People v. Crittenden*, 885 P.2d at 902–06. As a result, the California Supreme Court's decision was contrary to clearly established federal law, and the district court properly considered the *Batson* claim "without the deference AEDPA otherwise requires." *Crittenden I*, 624 F.3d at 954 (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)).

B. *The state trial court's factual findings were rebutted by clear and convincing evidence*

We also reject the state's contention that *Crittenden I* failed to afford a presumption of correctness under 28 U.S.C. § 2254(e)(1) to the state trial court's finding that Crittenden did not establish a prima facie violation at *Batson* step one. We said in *Crittenden I* that "[w]e presume the state court's factual findings to be correct, a presumption the petitioner has the burden of rebutting by clear and convincing evidence." 624 F.3d at 950. The district court found, and *Crittenden I* affirmed, that Crittenden rebutted that presumption as to the *Batson* step one finding. His clear and convincing evidence included that the crime was racial in nature, Casey was the only African-American juror in the venire and the only juror subject to a meritless for-cause challenge, and there was a disparity between the prosecutor's rating of Casey and his ratings of comparable white jurors. That ratings disparity, discussed in further detail below, is new evidence not presented to the state trial court.

We disagree with the dissent that *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), precludes *Crittenden I*'s consideration of that new ratings evidence to rebut the trial court's factual finding at *Batson* step one. *Pinholster* precludes the consideration of new evidence only for the purpose of determining whether the last reasoned state court decision was contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts under 28 U.S.C. § 2254(d). *See Pinholster*, 131 S. Ct. at 1398 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court . . . ."). We have since clarified – after *Pinholster* and the cases cited in the dissent – "If we determine, considering only the

evidence before the state court," the petitioner has satisfied
§ 2254(d), "we evaluate the claim de novo, and we may
consider evidence properly presented for the first time in
federal court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.
2014) (citing *Pinholster*, 131 S. Ct. at 1401); *see also
Johnson v. Finn*, 665 F.3d 1063, 1069 n.1 (9th Cir. 2011)
(holding *Pinholster* did not preclude the district court from
conducting an evidentiary hearing *after* concluding the state
court of appeal's decision was contrary to clearly established
law under § 2254(d)(1)).**[5]**

In reviewing the merits of a habeas petitioner's claim
after § 2254(d) is satisfied, we still defer to a state court's
factual findings under § 2254(e) in two ways. First, those
findings are presumed to be correct, a presumption that can
be overcome only by clear and convincing evidence. *See*
28 U.S.C. § 2254(e)(1). Second, with limited exceptions,
new evidence cannot be considered if "the applicant has
failed to develop the factual basis of a claim in State court
proceedings," *id.* § 2254(e)(2) – which is not the case here.
The dissent would introduce a third layer of deference,
confining review of a state trial court's factual findings under

---

**[5]** This case law is consistent with authority in the Fifth and Sixth
Circuits. *See Harris v. Haeberlin*, 752 F.3d 1054, 1057 (6th Cir. 2014)
("*Pinholster* is inapplicable to this case because it precludes consideration
of evidence introduced in federal court only when determining whether a
state [appellate] court's adjudication of a claim involved an unreasonable
federal-law error. Here, by contrast, the evidence introduced in federal
court was not considered for the purpose of ascertaining whether the state
[appellate] court had unreasonably applied clearly-established federal law,
because we had already concluded that the state court had done so."
(citation omitted)); *Smith v. Cain*, 708 F.3d 628, 635 (5th Cir. 2013)
("Because the district court appropriately and correctly concluded that the
state court had unreasonably applied *Batson* under section 2254(d)(1)
based solely on the state court record, *Pinholster* is inapplicable.").

§ 2254(e)(1) to the record before the state trial court. But nothing in *Pinholster* or *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014), requires limiting the record on review once a federal court has found unreasonable the last reasoned state court decision – here, that of the California Supreme Court. The state does not argue otherwise.

Here, *Crittenden I* held the California Supreme Court's decision was contrary to clearly established law under § 2254(d)(1) because it applied an improper legal standard at *Batson* step one. Having made that determination, *Crittenden I* properly turned to the merits of Crittenden's *Batson* claim, while affording a presumption of correctness to the state trial court's factual findings under § 2254(e). Thus, contrary to the argument advanced by our dissenting colleague, *Crittenden I* properly considered new evidence in rejecting the state trial court's *Batson* step one finding under § 2254(e).

## III.    The district court was not required to conduct its own evidentiary hearing

The state next argues the district court erred by rejecting the magistrate judge's recommendation without conducting its own evidentiary hearing, in violation of *Johnson*, 665 F.3d at 1063. *Johnson* held, in the *Batson* context, "a district court may not . . . reject a magistrate judge's proposed credibility determination without hearing and seeing the testimony of the relevant witnesses." *Id*. at 1074. This case is distinguishable because the magistrate judge did not make – and hence the district court did not reject – any credibility determination related to the prosecutor's explanation for striking Casey, because the prosecutor offered none.

At the evidentiary hearing, which took place over a decade after the trial, the prosecutor could not articulate a race-neutral explanation for his peremptory challenge. Instead the state reconstructed a race-neutral justification based on the evidence in the record. As the district court stated, "the prosecutor's credibility as to his articulated race-neutral reason was never at issue in this case." Thus, the district court did not reject any credibility determination by the magistrate judge, but instead, based on the court's independent review of the record, drew different inferences and reached different conclusions than the magistrate judge. The court was not required to conduct a new evidentiary hearing.

**IV.     The district court's finding that the challenge was substantially motivated by race was not clearly erroneous**

Turning to the merits of Crittenden's *Batson* claim, we hold the district court's finding that the prosecutor's challenge of Casey was substantially motivated by race was not clearly erroneous. A finding is clearly erroneous if it is "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Unites States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (quoting *Anderson*, 470 U.S. at 577). The court's finding of purposeful discrimination is supported by the facts in the record. First and foremost, the court found the XXXX rating of Casey was evidence of racial bias. A comparative juror analysis shows the XXXX rating on which the prosecutor based his challenge cannot be explained by Casey's death penalty views or other race-neutral factors. The prosecutor's meritless for-cause challenge provides additional support for the district court's finding that he was

substantially motivated by race. Further, because we conclude the district court found only purposeful discrimination, we reject the dissent's contention the court found or relied on unconscious bias.

A. *Comparative Juror Analysis*

"Comparative juror analysis is an established tool at step three of the *Batson* analysis for determining whether facially race-neutral reasons are a pretext for discrimination." *Crittenden I*, 624 F.3d at 956 (citing *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)). The prosecutor's ratings of prospective jurors provide a useful basis for a comparative juror analysis because he closely adhered to the ratings when issuing challenges. Indeed, he testified that, when he assigned the ratings after each voir dire, "it was at that time that I made a decision."

1. *Comparison with Juror Smith*

The district court found a comparison of Casey and another juror, Lois Smith, weighed in favor of finding racial bias. Smith was the only other prospective juror rated XXXX. The court found Smith was a far worse juror for the prosecution than Casey. It stated Smith's "distinctly strong and unshakable death penalty views and experiences with the justice system made her the antithesis of a prosecution juror." The court observed it was "puzzling why Casey received the same rating as Smith, when no similarly glaring evidence for prosecutorial disfavor of Casey exists."

The court's findings from the comparative analysis of Casey and Smith were not clearly erroneous. Smith also recounted what she described as a "horrendous" experience

with law enforcement in which her husband was wrongly implicated in a crime by an eyewitness who had identified him notwithstanding that he is white and the suspect was African-American. She said she "would be extra cautious" because of that experience. The district court reasoned this experience would have been of particular concern to the prosecution because "a key element of [the] evidence against [Crittenden] at trial was that eye witnesses had seen a black man matching [Crittenden's] description near the victims' home when the murders occurred."

Casey, in contrast, presented no similar negative experiences with law enforcement. And, as the court correctly noted, aside from her death penalty views, Casey was a "model prosecution juror according to [the prosecutor's] own criteria." The prosecutor testified he looked for jurors who were "employed, homeowners . . . people who had something to lose in society, who might be victims of crime, solid citizens, preferably fairly well educated." Casey had been married for 42 years, had two adult children, went to church on Sundays, had lived in the same home for 17 years, and said she was concerned about drugs and street gangs.

Although Casey opposed the death penalty, she repeatedly affirmed that her opposition would not prohibit her from following the court's instructions, applying the proper standard of proof or voting to impose the death penalty. The trial judge asked "whether your feelings concerning the death penalty would influence your vote to the extent . . . that you would not vote for a first degree murder conviction," and she answered, "No." The judge then asked whether her death penalty views would cause her to refuse to vote for special circumstances that would implicate the death penalty, and she

answered, "No." The judge then asked whether her death penalty views would cause her to "automatically and in every case vote against the imposition of the death penalty," and she answered, "No."

When questioned by defense counsel, Casey again said she could conceive of a situation in which the death penalty might be appropriate, she would be willing and able to vote for the death penalty if a crime were "awful bad" and she had no "qualms" about applying the court's instructions regarding the proper standard of proof. The prosecutor then began his examination by asking Casey, "Now, I gather[] . . . that you do not believe in the death penalty?" Casey answered:

> I really don't. But if it is bad, . . . really bad and I felt that, you know – I hate death. I don't know how to express myself, really. But I really hate to see anybody be put to death. And I hate to see someone take a life. I don't care whose it is. So – it is – it is hard for me to express it. But I could, if proven to me, to, no doubt, that it was a crime, then I don't think I would hesitate.

Upon further questioning, Casey expressed some hesitation, saying, "if it is proven to me, truly proven to me, and I feel deep down inside that he did it, I could. I think I could. . . . I have to say I think I could. This is all new to me. So I am very upset with it." She also said she thought her feelings about the death penalty would make it difficult for her to make a decision regarding the death penalty, and she did not know whether it would substantially impair her ability to fairly evaluate the evidence. She then reaffirmed, though, that her feelings about the death penalty would not cause her

to "lean[] toward life instead of death," and that she could vote for the death penalty if she "heard facts and circumstances which warranted it."

Although Casey and Smith both expressed opposition to and reservations about imposing the death penalty, the voir dire transcripts support the court's conclusion that Smith was the worse juror for the prosecution.  Smith arguably expressed stronger opposition to the death penalty than did Casey – she said she found the prospect of serving on a jury in a death penalty case "horrifying" – and recounted a "horrendous" experience with law enforcement caused by mistaken eyewitness identification.  The court did not clearly err by concluding the comparison of Casey and Smith supports the conclusion that the prosecution's challenge of Casey was substantially based on her race.[6]

### 2.  *Comparison with Clark and Krueger*

The district court also found a comparison of Casey with jurors Gisela Clark and Mary Krueger provided "strong evidence of discriminatory motive."  The court found, although Clark and Krueger "are demographically similar to Casey, except they are both white," and although they "expressed death penalty views generally unfavorable to the prosecution," they were both rated at least ✓✓, and selected to serve on the jury.

The court's comparative analysis of Casey and Clark is supported by the evidence.  The prosecutor rated Clark

---

[6] In reaching this conclusion, the district judge on remand agreed with the district judge who reviewed the case prior to the first appeal, as well as the magistrate judge.

✓✓✓. Aside from race, Clark was demographically comparable to Casey. She had been married for 34 years before her husband passed away, lived in the same home for 21 years and identified as Catholic. On her questionnaire, Clark wrote that she was "against" the death penalty. At voir dire, she expressed strong opposition to the death penalty and serious reservations about her ability to vote for it:

> My opinion is this. First of all I am Catholic, and I have been brought up no matter what, I cannot take somebody's life, I don't feel that I am better than the next person. Or another reason I think that I am not quite sure which is the worse thing a person can do. Whether the worse thing is murder or the worse thing is defrauding someone of their life savings. And I always felt – even voting for it, I felt if I am for it, I should be the one that should execute it more or less. My feelings. But, I shouldn't ask someone else to do it for me. And, therefore, I feel opposed to it. I just don't feel I should take someone's life.

The trial judge then asked Clark whether, no matter what the circumstances might be, she would ever vote to sentence someone to his death, and she answered, "Probably not." On further questioning from the judge, she provided a more equivocal answer: "I have never been in that predicament. I am not quite sure how I would react. I feel the person should be punished for their crime. Maybe I could. I am not sure what would happen." After a few more questions, the judge again asked, "would you in every case automatically vote for life imprisonment without the possibility of parole, and would you never vote to impose the death penalty," and she again

equivocated, stating, "I don't – I am really not sure." In contrast, when the trial judge asked Casey whether she would automatically, in every case, vote against the imposition of the death penalty, Casey answered, unequivocally, "No."

To be sure, in response to questioning from defense counsel, Clark expressed a greater willingness to vote for the death penalty than she had earlier. Defense counsel asked, if "information indicated that not only were the crimes bad, but there were aggravating matters about this defendant that were also brought to your attention – if those matters that you heard indicated to you that death was the appropriate verdict, would you be able to vote for such a verdict?" Clark answered, "Yes." Later, though, Clark again equivocated. The prosecutor asked, "Are you telling us now that your feelings about the death penalty are not so strong and that you could actually fairly and impartially decide on the penalty in the case?" Clark replied:

> Probably. I have, like I said, I have never been in this kind of predicament, so I am sure if the law would be, have to be applied, I would, probably could. But I am not a hundred percent sure. I would have to see what happens during the whole trial to be convinced. I really don't know. I can't really tell you how I feel about it. All my life I felt I can't take someone's life. But that doesn't mean – I have never be in this kind of predicament. I mean in this kind – so I don't know. It is possible I could be completely convinced.

In sum, Clark and Casey were demographically similar, apart from race, and both similarly equivocated regarding their ability to vote for the death penalty. But the prosecutor rated Clark ✓✓✓, and selected her to serve on the jury, whereas he rated Casey XXXX, attempted to strike her for cause and then used a peremptory challenge against her. As we noted in *Crittenden I*, even if Clark was clearer than Casey about her ability to vote for a death verdict and to be decisive, "both expressed hesitancy or uncertainty," and "the wide difference between [the prosecutor's] rating of Ms. Casey and Ms. Clark is evidence from which an inference of discrimination could have been drawn." 624 F.3d at 956 & n.3. That wide difference in ratings provides strong additional support for the district court's finding that the prosecutor was substantially motivated by race. *See Miller-El*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

The district court's comparative analysis of Casey and Krueger also is supported by the evidence. The prosecutor rated Krueger ✓✓ and ½ ✓. On her questionnaire, Krueger wrote, "no one should receive [the] death penalty." At voir dire, the trial judge asked Krueger about her death penalty views, and she said, "I think I would have to be absolutely sure that the person were without a doubt guilty of the crime before I would be able to say a death penalty." The judge also asked Krueger whether she would "automatically and in every case vote for life without the possibility of parole and never vote for a death penalty," and Krueger answered, "No. I think I would be able to vote for the death penalty."

The prosecutor then asked Krueger again about her "general feeling about the death penalty," and she answered, "Well, I feel very strongly that someone, who is in life – in prison without any parole is – to me is close to death. I mean, there's nothing that they can do, but be there. But at the same time, I – I, myself, would have to have no doubt in my mind, that the individual was guilty, before I would be able to vote for the death penalty."

Thus, like Casey, Krueger expressed opposition to the death penalty and some hesitation about applying it, but also said multiple times she could follow the law and vote for the death penalty in certain circumstances. We held in *Crittenden I* the "marked difference" in the ratings of Casey and Krueger "adds to the evidence from which . . . an inference [of discrimination] could be drawn . . . given the demographic similarity and somewhat analogous views on the death penalty." 624 F.3d at 956. Although Krueger arguably expressed less hesitancy than Casey about her ability to vote for the death penalty, the marked difference in their ratings provides additional support for the district court's finding that race substantially motivated the challenge of Casey. *See Miller-El*, 545 U.S. at 241.

### 3. *Comparison with Sullivan and Tennies*

Finally, the district court found a "comparison of [other] anti-death penalty jurors reveals that anti-death penalty views were not X or ✓ determinative." The court found prospective juror Suzanne Tennies, who was rated ✓✓, had "repeatedly expressed strong anti-death penalty views during voir dire, . . . [the prosecutor] noted on her questionnaire 'probably wouldn't vote for DP.'" Similarly, the court found prospective juror Frances Sullivan, who was rated ✓✓,

"stated he would 'automatically and in every case vote for life without possibility of parole and never vote for the death penalty.'"  Although neither Tennies nor Sullivan was selected for the jury, the court found their positive ratings provided further evidence that the state's proffered race-neutral reason for Casey's XXXX rating and challenge – her opposition to the death penalty – was pretextual.[7]

The court's findings with respect to Tennies and Sullivan are supported by the evidence.  Tennies wrote on her questionnaire, "I'm not for the death penalty."  At voir dire, the trial judge asked whether Tennies would absolutely and in every case refuse to vote for the death penalty, and she answered, "No."  When defense counsel then asked her the same question, though, Tennies equivocated, saying, "I really feel strongly against the death penalty.  But I – on the other hand, I would have to hear the whole facts of the case.  So, it is kind of a hard question for me to answer."[8]  The prosecutor then asked her what she meant by her statement that she did not believe in the death penalty, and she explained:

> Well, I just kind of feel that – there have been
> cases, you know, I have read – not lately, but,

---

[7] The dissent maintains the district court's comparison to Sullivan and Tennies was "misplaced" because neither was allowed to serve.  We disagree.  The district court properly relied on *all* of the prosecutor's ratings because the ratings all were made before Casey was struck, all were relied on when the prosecutor exercised his peremptory strikes, and all indicate – when examined together, in their entirety – the prosecutor's initial assignment of ratings was substantially motivated by race.

[8] Both Sullivan and Tennies, like Casey, and like Smith, Clark and Krueger, also later said they could follow the law and, in some circumstances, vote for the death penalty.

you know, years and years ago, where they found the person they put to death was innocent, so somebody came forth and said they committed the crime. I can't remember exact, you know, things. So I just always felt that, you know, that would be wrong. You know, unless you knew a hundred percent that person was guilty.

Tennies then said she would not have difficulty signing the jury verdict to impose the death penalty if she thought the defendant deserved it, and her feelings against the death penalty would not interfere with her ability to make a decision as a juror.

Although Tennies said she could vote for the death penalty, she also expressed clear opposition to and hesitancy about imposing it. Therefore, Tennies' ✓✓ rating supports the district court's finding that "anti-death penalty views were not X or ✓ determinative," and its resulting inference that the state's proffered race-neutral justification – opposition to the death penalty – for rating Casey XXXX and challenging her, was pretextual.

With respect to Sullivan, although he wrote on his questionnaire that he was "for" the death penalty, at voir dire he said he would automatically and in every case vote for life without possibility of parole and never vote for the death penalty. The trial judge asked him to clarify, and he said, "I have reservations about the death penalty. I can't see a person sitting around ten years on death row and then putting them to death after he had been punished already for ten years. It don't make sense to me." Sullivan went on to say, however, that he would not have a problem following the law,

and his reservations would not affect his ability to determine whether to impose the death penalty. Although Sullivan expressed less hesitation than Casey, given his stated concerns about the death penalty, his ✓✓ rating also supports the district court's finding that "anti-death penalty views were not X or ✓ determinative."

### 4. *Comparison with other seated jurors when Casey was challenged*

At the time Casey was challenged, only one other seated juror had received an unfavorable rating. The magistrate judge found the makeup of the jury at that time was "critical" because, although Casey should not have been rated XXXX, she should have been rated with at least one X, given her opposition to and equivocation regarding the death penalty. Had she been rated with one X, the prosecutor likely still would have challenged her. As a result, the magistrate judge reasoned, the makeup of the jury at the time Casey was challenged shows that "she would have been stricken regardless of her race."

The district court properly declined to grant this factor substantial weight. Initially, as the court explained, we cannot assume, even if "Casey objectively deserve[d] to be in the X category, [the prosecutor] himself actually was motivated to put her in that category for nondiscriminatory reasons." As discussed above, white prospective jurors expressed similar views regarding the death penalty yet were rated with multiple ✓s. Therefore, Casey, too, might have been rated with ✓s if race had not been a factor.

More significantly, even assuming there were a race-neutral justification for at least a single X rating of Casey,

and such a rating would have led to the challenge, that is not the dispositive question. Under the standard articulated in *Cook*, the question is whether race was a substantial motivating factor. *See Cook v. LaMarque*, 593 F.3d 810, 814–15 (9th Cir. 2010); *Crittenden I*, 624 F.3d at 958. Independent, race-neutral reasons for the challenge do not preclude a finding that race also was a substantial motivating factor. *See Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc) ("A court need not find all nonracial reasons pretextual in order to find racial discrimination"). Here, as the district court reasoned, the XXXX rating "virtually assured Casey would be struck at some point." Because the prosecutor essentially predetermined at the outset that Casey would be challenged, the makeup of the jury at the time she was in fact challenged is entitled to little weight.[9]

In sum, because jurors comparable in their death penalty views and otherwise were rated with ✓s, and some were selected for the jury, the comparative juror analysis significantly weakens the government's race-neutral explanation for Casey's XXXX rating and challenge. That analysis is strong evidence in support of the district court's finding that the challenge of Casey was substantially motivated by race.[10]

---

[9] The dissent errs by focusing on the magistrate judge's supposition that Casey would have been stricken regardless of her race. That is not now, and has never been, the *Batson* standard, as *Cook* makes clear.

[10] We are not persuaded by the state's argument that "the record reveals a number of non-discriminatory factors that are more plausible reasons for the [XXXX] rating than racial bias," including Casey's concern about transportation to and from the court, her general indecision and her reluctance to serve on a jury. As discussed earlier, Clark and Tennies both expressed indecision about their ability to vote for the death penalty, yet

B. *The for-cause challenge*

The district court also found the prosecutor's for-cause challenge of Casey based on her general opposition to the death penalty was evidence he was substantially motivated by race. In *Crittenden I*, we held:

> the circumstances of the prosecutor's for-cause challenge of Ms. Casey also add to the evidence from which an inference of improper discrimination could be drawn. The prosecutor said he challenged her for cause because she did not believe in the death penalty; however, it was well established law at the time that challenges for cause based on a juror's general objections to the death penalty were improper.

624 F.3d at 956–57 (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

The state contends the for-cause challenge was made in good faith because Casey's voir dire responses suggested her opposition to the death penalty "substantially impaired her ability to be a juror." The prosecutor, though, did not make the for-cause challenge on that ground. Instead, he stated "[t]he People voice a challenge for cause based upon her

---

were rated with at least two checkmarks. Further, as the magistrate judge found, "[a]lthough Casey raised a concern that she would need to make arrangements to get to the court, after being questioned and reassured by the judge, her transportation issue appeared resolved." Finally, Casey's statement that serving on a jury was "scary" is not sufficient to account for the significant difference in juror ratings.

answer that she doesn't believe in the death penalty." Not only was it clearly established at the time of the trial that general opposition to the death penalty did not provide a basis for a for-cause challenge, but also as discussed above, Casey repeatedly said she would be able to follow the instructions of the court and vote for the death penalty.

The magistrate judge agreed that "the meritless cause challenge . . . evidenced an ulterior motive to remove" Casey from the jury, but gave this evidence little weight because he found the prosecutor also had challenged prospective juror Jonell Moreno for cause based on her general objections to the death penalty. The district court reasonably concluded, however, that Moreno had voiced more than general objections to the death penalty. Moreno said she would not want to be the foreperson of the jury because she would not want to sign the death verdict. As the district court concluded, "Moreno's stronger and more specific objection to the death penalty materially distinguishes Moreno from Casey." The for-cause challenge thus provides some additional support for the district court's finding that the prosecutor's challenge of Casey was substantially motivated by race.

Viewed cumulatively, Casey's XXXX rating, which essentially predetermined that she would be challenged, the wide disparity between her rating and the ratings of comparable white jurors and the meritless for-cause challenge provide sufficient evidence from which the district court logically could find the prosecutor's decision to challenge Casey was substantially motivated by race. *See United States*

*v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).[11] The district court did not clearly err.

## C.  *Unconscious Bias*

The dissent contends the district court erroneously based its finding of a *Batson* violation in part on unconscious bias. The district court's decision refutes that reading.  As the court explained, it undertook "a sensitive inquiry into [the] circumstantial and direct evidence of intent" and found the prosecutor engaged in "purposeful discrimination."  Its order repeatedly articulated the court's holding that the prosecutor's strike "was motivated in substantial part by race," and affirmatively rejected the proposition that that holding was "based on the existence of unconscious discrimination." According to the district court, the evidence thus left "no doubt" that a conscious, "racially discriminatory impetus" motivated the prosecutor's strike of Casey.

---

[11] The district court also found the prosecutor's challenge of an African-American prospective juror in a prior capital case provided "some evidence" of discriminatory motive.  In that case, the prosecutor said the "most important[]" reason for striking the juror was that "he was the President of the Student Law Union of Minorities . . . which indicates to me a sympathy for minorities, and in this case, since the Defendant is a minority, People feel that there would be a bias in that regard."  In *Crittenden I*, we held that "[t]he probative value of this information is weak because it is a single instance and the trial court denied the *Batson* objection in that case."  624 F.3d at 957 n.4.  The district court found this evidence was entitled to "slight weight."  We agree this evidence does not add significantly to Crittenden's case.  The district court also relied on the prosecutor's allegedly disparate mode of questioning Casey, as compared to other prospective jurors.  For the reasons we stated in *Crittenden I*, we do not find that factor to "add significantly to [Crittenden's] prima facie case."  624 F.3d at 957 n.4.

The dissent makes much of the district court's passing comment that "[t]he [side-by-side juror] comparisons demonstrate that . . . [the prosecutor] was motivated, consciously or unconsciously, in substantial part by race." But all the court meant was, whatever the *explanation* for the prosecutor's racial motive, that motive was a substantial reason for his use of a peremptory strike. As the court clarified:

> [T]he court cannot, and does not, address why [the prosecutor] was motivated by race. The court cannot say whether [he] thought Casey would be partial to petitioner "because of their shared race," *Batson*, 476 U.S. at 97, or if he was influenced solely by "conscious or unconscious racism," *id.* at 106. And it need not. The court's reference to the potential for unconscious racism . . . clarif[ied] that the court in no way sought to impugn [his] character as it undertook the *Batson* inquiry
> . . . .

In other words, *why* the prosecutor had a conscious racial motive to strike Casey in the first place – whether or not "unconscious racism" partly explained that motive – was simply irrelevant to the *Batson* inquiry.[12]

---

[12] It was relevant, of course, to the prosecutor's reputation. The district court's reference to "unconscious racism" spared him from being found a racist. By suggesting the prosecutor may have had more benign racial motives for the strike, or that his racial motive may have been influenced by unconscious racism, the court hoped to shield the prosecutor from possible disrepute. As the court made clear, however, this effort was not designed to – and did not – detract from the court's key finding that the strike was consciously motivated by race.

We agree. And because we uphold the district court's finding of a conscious racial motive, we do not – and need not – address whether unconscious bias can establish a *Batson* violation.

## CONCLUSION

We affirm the judgment of the district court.

**AFFIRMED.**

---

McKEOWN, Circuit Judge, dissenting:

Due process demands that no defendant should face a biased jury. Nonetheless, the mental gymnastics demanded by a retrospective jury analysis taking place decades after the trial suggest that Justice Marshall was prescient in his concurrence in *Batson:* "The decision today will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely." *Batson v. Kentucky*, 476 U.S. 79, 102–03 (1986) (Marshall J., concurring).

I part ways with the majority's ultimate conclusion that Crittenden has proven that the prosecutor's challenge to the single black juror was substantially motivated by race in violation of *Batson*. 476 U.S. 79. I join the majority as to Part I (the *Teague* analysis) and Part II.A (the lack of AEDPA deference to the California Supreme Court's *Wheeler* analysis). Otherwise, I respectfully dissent.

Let me turn now to what happened in this case in 1989. In observing voir dire, the trial judge characterized potential juror Manzanita Casey as "indecisive" and noted that she "couldn't decide whether or not she would be able to follow the law." He presciently observed that a "*Wheeler* motion would be inappropriate." Striking a juror who is a death penalty "wobbler" is hardly a basis to impute purposeful discrimination to the prosecutor. In light of the evidence presented in state court, and the heavy deference we owe to the trial judge's firsthand observations, we should not disturb the trial court's fact-bound determination that Crittenden did not make out a prima facie case of discrimination under *Batson*.

Crittenden's case does not improve under step three of the *Batson* analysis. At this stage, our review is de novo because the California Supreme Court invoked the wrong legal standard. But de novo review does not mean that we can, after the fact, stack inference upon inference, impute motive when none was demonstrated, or use new evidence to construct a hypothetical record that never existed. Because the evidence is ultimately inconclusive as to the prosecutor's state of mind in 1989, and does not clearly support pretext, Crittenden failed to prove purposeful discrimination.

In the end, Crittenden's case should not rise or fall on the after-the-fact significance imputed to the prosecutor's XXXX rating of Casey.[1] The majority's analysis boils down to a

---

[1] Crittenden's other evidence does not add significantly to the analysis. As the prior panel opinion and the majority note, the prosecutor's other case involving an unsuccessful *Wheeler* challenge adds little; the same is true with respect to the prosecutor's "gas chamber" voir dire question. *See Crittenden v. Ayers*, 624 F.3d 943, 957 n. 4 (9th Cir. 2010) ("*Crittenden*

feeling that although perhaps Casey deserved an XX or even XXX rating, the fourth X looms large and could only signify racial bias. This entire mode of analysis is folly, for it grafts scientific certitude onto a back-of-the-hand rating system, which the prosecutor himself described as a "de minimus approach." According to the prosecutor, the precise number of Xs "wasn't a very scientific notation," and the same juror "could have been a two or a three, or a three or a four." We have no Rosetta Stone to unlock the meaning of the fourth X; it is a mistake to order a new trial based on this speculative foundation as to a single juror.

## I. *Batson* Step One—Crediting the Trial Court's Factual Finding

Under *Batson* step one, Crittenden must "show[] that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94. The state trial court found that Crittenden did not meet this standard. Under both the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") and *Batson* principles, overturning such a finding requires "exceptional circumstances." *Davis v. Ayala*, 135 S. Ct. 2187, 2201 (2015) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). Because there is nothing amiss about the trial court's finding—much less *exceptionally* wrong—that conclusion should have ended the matter. Instead, the majority second-guesses the fact-bound decision of the state trial judge with a

---

*I*"). The prosecutor's earlier for-cause challenge of Casey is similarly unpersuasive and wasn't even mentioned by Crittenden's counsel in making his *Wheeler* motion. The prosecutor also unsuccessfully challenged a white juror for cause based on similar anti-death penalty statements.

raft of new evidence introduced in federal habeas proceedings. I dissent from this upside-down approach to deference.

The starting point is AEDPA, 28 U.S.C. § 2254(e)(1), under which the trial court's factual finding is "presumed correct" and Crittenden "has the burden of rebutting that presumption by 'clear and convincing evidence.'" *Ayala*, 135 S. Ct. at 2199–2200 (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)). In light of AEDPA's mandate, "we normally review the state trial court's fact-specific determination of whether a defendant has made a *prima facie* case of a *Batson* violation deferentially, applying AEDPA's 'statutory presumption of correctness.'" *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002) (quoting *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000)). In contrast, "where the trial court has applied the wrong legal standard, AEDPA's rule of deference does not apply." *Id.*; *see also Cooperwood v. Cambra*, 245 F.3d 1042, 1046 (9th Cir. 2001).

Nothing reflects that the trial court applied the wrong legal standard or otherwise erred in its application of *Batson* step one. Importantly, neither the majority nor Crittenden suggests otherwise. Although, in 1994, the California Supreme Court conflated *Batson's* "reasonable inference" test with *Wheeler's* more stringent "strong likelihood" test, *see* Majority Part II.A, there is no reason to think that the trial judge committed that same mistake five years earlier.[2] Nor can

---

[2] In denying Crittenden's prima facie case, in February 1989, the trial judge did not detail the standard he was applying. Before 1994, we presume that California state courts applied the correct *Batson* standard. *Terhune*, 202 F.3d at 1196–97. Even absent the *Batson*-specific presumption, the Supreme Court repeatedly has "instruct[ed] us to give

Crittenden summon clear and convincing evidence that the trial court erred in assessing whether there was a prima facie case of purposeful discrimination based on the evidence before the state court. The prima facie determination is a factual inquiry that is "peculiarly within a trial judge's province," *Ayala*, 135 S. Ct. at 2201 (quoting *Snyder*, 552 U.S. at 477), because the trial judge plays a pivotal role supervising voir dire and is "best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes," *id. See also Tolbert v. Page*, 182 F.3d 677, 683 (9th Cir. 1999) (en banc) (noting that, at *Batson* step one, "the trial judge's unique perspective of voir dire enables the judge to have first-hand knowledge and observation of critical events" and to "personally witness[] the totality of circumstances that comprises the 'factual inquiry'" at issue, making heavy deference appropriate).

In his *Wheeler* motion, Crittenden's counsel made two primary points. He noted that the same prosecutor faced an unsuccessful *Wheeler* challenge in a previous case. Additionally, Casey, as an African-American, was "a member of a cognizable racial group" and was in fact the "only member of the identifiable group" among the voir dire panelists. Neither contention satisfied the requirements for a prima facie showing.

---

state courts the benefit of the doubt when the basis for their holdings is unclear." *James v. Ryan*, 733 F.3d 911, 916 (9th Cir. 2013). Significantly, we owe deference to the state trial court notwithstanding the California Supreme Court's subsequent legal error. *See Rever v. Acevedo*, 590 F.3d 533, 537 (7th Cir. 2010).

The prosecutor's earlier *Wheeler* challenge was "weak" evidence because, as we explained in Crittenden's first appeal, it was "one isolated incident in which the trial court denied the *Batson* objection," and "it did not add significantly to his prima facie case," *Crittenden I*, 624 F.3d at 957 n. 4. Nor does "the fact that the juror was the one Black member of the venire," in and of itself, "raise an inference of discrimination." *Terhune*, 202 F.3d at 1198 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)). "More is required." *Id.*

Benchmarked against the defense counsel's proffer at the prima facie stage, the trial judge gave specific reasons, based on his firsthand observations, for finding no inference of discrimination. Even before the prosecutor and defense counsel began jury selection, Crittenden's counsel alerted the trial judge that he planned to make a *Wheeler* motion—and already had prepared a written motion to that effect—if the prosecutor struck Casey, the sole black member of the venire. The judge therefore was acutely attuned to the issue of discrimination and took notes on Casey's demeanor and voir dire answers. The judge's notes and impressions "revealed that at the very time that we questioned Ms. Casey, my exact quotation is: 'This is a case where a *Wheeler* motion would be inappropriate, because of the fact that she is indecisive and cannot guarantee that she would vote in a certain way.' . . . She couldn't decide whether or not she would be able to follow the law."

Context is key. Before striking Casey, the prosecutor used peremptory strikes against 14 white jurors—consistently targeting those who expressed doubt about the death penalty. To cite a few examples, the prosecutor used his first peremptory against juror Smith, who stated, "I do not believe

in [the death penalty] as a general rule—there are exceptions." The prosecutor used his fourth peremptory against juror Gilbert, who described himself as an "extremely liberal person" and said he "would have a difficult time voting for the death penalty." The sixth strike removed juror Pisarek, who generally opposed the death penalty but recognized it was the law and, unlike Casey, was unequivocal that she could vote for it. The prosecutor's tenth strike went against juror Works, who believed that "all life is precious" but added that she wouldn't conscientiously object to voting for the death penalty. The prosecutor struck juror Henley, whom he labeled as "Borderline DP weak" despite Henley's bland statement on his juror questionnaire that "[t]here are times and circumstances when I have considered [the death penalty] appropriate."

The strike of Casey hardly stands out. Casey opposed the death penalty, and the death penalty was the overriding focus of Crittenden's capital trial. On her juror questionnaire, Casey wrote: "I don't like to see anyone put to death." During her voir dire question-and-answer session, Casey continued to express hesitancy about capital punishment. "I am against death—being put to death," she said at one point. "And I am against people killing people." Given the prosecutor's pattern of peremptory strikes and Casey's death penalty views, the trial judge understandably cited "abundant [] reasons" why he expected and accepted a peremptory challenge against her.

The prior panel compared Casey to two white jurors—Clark and Krueger—who ultimately served on Crittenden's jury. *Crittenden I*, 624 F.3d at 957. However, that prior decision was issued before *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). Now, "[w]hen examining a

petitioner's habeas claim through the AEDPA lens, we 'focus[] on what a state court knew and did,'" and "thus consider 'how the [state court] decision confronts [the] set of facts that were before [it],' rather than how it should have confronted a new set of facts presented for the first time in federal court." *Jamerson v. Runnels*, 713 F.3d 1218, 1226 (9th Cir. 2013) (last four alternations in original) (quoting *Pinholster*, 131 S. Ct. at 1399)). The two white jurors entered the jury box *after* the prosecutor struck Casey and the trial judge denied Crittenden's *Wheeler* motion. Hence, when the trial judge denied the prima facie case, he could not have divined that Clark and Krueger later would be permitted to serve on the jury. Nor did Crittenden's counsel renew his *Wheeler* motion at any subsequent point. A post-hoc, comparative analysis in these circumstances has no place in evaluating the trial court's finding of fact at the prima facie stage. Even if the juror analysis is appropriate, the comparison hardly provides *clear and convincing* evidence that the trial judge got it wrong, because both subsequently seated white jurors are readily distinguishable from Casey. *See* Section II.B.

In repudiating the trial court's prima facie finding, the majority mistakenly relies on evidence produced at the 2002 federal evidentiary hearing—namely, the prosecutor's notations rating jurors in the margins of their questionnaire sheets. No state court was ever privy to this evidence. As we recently explained, "after *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2)." *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014). As we explained in *Murray*, *Pinholster* cabins our review under § 2254(e)(1), because it "eliminated the relevance of 'extrinsic' challenges

when we are reviewing state-court decisions under AEDPA." *Id.* at 999.

Of course, where the conditions for de novo review are satisfied—*i.e.*, when the factual finding is rebutted under § 2254(e)(1)—*Pinholster* may allow for new evidence adduced during federal habeas proceedings. But first things first: Because our review under step one is constrained by AEDPA deference and Crittenden has not effectively rebutted the trial court's initial factual finding, we are not in de novo review mode at this stage. This conclusion follows from a faithful reading of *Murray*. I acknowledge that the post-*Murray* cases cited by the majority may be in tension with *Murray*, given that they appear to support new fact-finding simply on the basis that the California Supreme Court alone rendered a decision contrary to clearly established law under § 2254(d)(1). *See Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014); *Johnson v. Finn*, 665 F.3d 1063, 1069 n.1 (9th Cir. 2011). That error cannot be imputed to the state trial court, however. Under *Murray*, the situation here is clear: the state trial court did not err in its factual finding that Crittenden failed to carry his burden, and therefore our review is cabined by the evidence before the trial court. In any event, the majority lacks authority to overrule *Murray* and cannot escape its holding simply by dismissing it as an earlier case–indeed, it was decided in 2014, the same year as *Hurles. See Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013). Crediting the state trial court's factual finding, I would deny Crittenden's habeas petition at step one of the *Batson* analysis.

## II. *Batson* Step Three: Failure to Establish the Prosecutor's Purposeful Discrimination

Even if it were appropriate to reach the ultimate *Batson* step three question of purposeful discrimination, I would still deny the petition because Crittenden has not shown that the prosecutor harbored substantial racist intent.[3] Decades after the voir dire, we are like archaeologists without a framework trying to piece together forgotten motives from small shards of imperfect and inconclusive evidence. The record does not establish that the prosecutor was "motivated in substantial part by discriminatory intent." *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010) (quoting *Snyder*, 552 U.S. at 485).

### A. *Batson* Standard of Review

The majority starts off on the wrong foot in its phase three *Batson* analysis, categorically deferring to the district court under a clear-error standard. The appropriate standard of review, given a context where we share the district court's task of reviewing a cold record, should be de novo review.[4]

---

[3] Under *Batson* step three, I agree with the majority that we could properly consider the new evidence from the 2002 federal evidentiary hearing. *See Johnson v. Finn*, 665 F.3d 1063, 1069 n.1 (9th Cir. 2011). Our review on this issue is de novo and the evidentiary limitations in § 2254(e)(2) do not apply because Crittenden cannot be faulted for a "lack of diligence" in the state courts. *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

[4] Even under a clear-error standard, I would reverse the district court. The weak evidence of racial motivation, the state court's factual finding on Casey's demeanor and decisiveness, and the district court's reliance on a theory of unconscious bias counsel denial of the petition.

We routinely recite Rule 52 of the Federal Rules of Civil Procedure and the "clear error" standard without putting the rule in context. Notably, in *Batson* itself, the Court stated that a "reviewing court *ordinarily* should give [factual findings] great deference," but only because "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility." 476 U.S. at 98 n.21 (emphasis added). Our cases applying *Batson* likewise continue to emphasize that deference is due particularly where the facts go to the demeanor and credibility of the prosecutor. *Cook*, 593 F.3d at 815–16 (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)).

What gets lost in this case is the layer-upon-layer review at issue. Because there was no step three analysis in the state courts, both we and the district court review the habeas petition de novo. To the extent there were true factual findings at the district court level, I agree that we should evaluate those findings under a "clear error" analysis. However, the reality is that aside from a handful of non-determinative factual findings made by the magistrate judge, which the district court neither relied on nor contested, the district court was simply reviewing a cold record of documentary evidence.

In short, our task is identical to that of the district court: applying the familiar tools of comparative juror analysis to a fixed record. In the unusual context of this case where nothing hinges on testimony from the evidentiary hearing, our review should be de novo. *See Holder v. Welborn*, 60 F.3d 383, 388 (7th Cir. 1995) (holding that no deference is owed to a district court deciding *Batson* habeas case on a cold record). The majority and I simply disagree on the standard of review.

The only factual findings and credibility considerations were made by the magistrate judge at the 2002 evidentiary hearing. At that hearing, the prosecutor testified that he "did not remember *anything* of significance to the exercise of his peremptory challenge" against Casey, which had occurred some 13 years earlier. (emphasis in original). The magistrate judge found that the prosecutor was "forthright in his factual testimony" about his lack of an independent recollection of the events of Crittenden's voir dire. Otherwise, the prosecutor testified about administrative matters, such as his handwriting and markings on juror questionnaires. The prosecutor also spoke, in general terms, about his methodology for ranking jurors, though he couldn't recall why he ranked any particular juror positively or negatively. The magistrate judge credited the prosecutor's testimony as to those matters and ultimately recommended denying Crittenden's habeas petition after analyzing the questionnaires and voir dire transcript, concluding that the prosecutor harbored "significant" but not "substantial" bias in striking Casey.

The district court did not disturb any of the magistrate's uncontroversial specific findings, which even if credited do not dictate whether the prosecutor's peremptory strike against Casey was legitimate. At best, the absence of specific evidence about the prosecutor's methodology simply means that Crittenden lacks evidence of animus. The district court rejected the magistrate's ultimate recommendation to deny Crittenden's habeas petition without holding a new evidentiary hearing, precisely because the live testimony and underlying factual findings from the 2002 hearing do not alter the outcome of the case. *See* Majority Op. Part III. The district court's analysis was based entirely on a retrospective review of the records from voir dire.

The habeas standard of review vis-a-vis *Batson* depends on which court's findings and determinations are under review. Of course in *Batson* itself, the Supreme Court emphasized the importance of giving deference to the *trial court* and reversing only in the case of clearly erroneous findings. 476 U.S. at 98 n.21. As we explained, "the trial judge's unique perspective of voir dire enables the judge to have first-hand knowledge and observation of critical events" and to "personally witness[] the totality of circumstances that comprises the 'factual inquiry'" under *Batson*, making deference appropriate. *Tolbert*, 182 F.3d at 683. "An appellate court can read a transcript of the voir dire, but it is not privy to the unspoken atmosphere of the trial court—the nuance, demeanor, body language, expression and gestures of the various players." *Id.* at 683–84. None of those rationales for deference apply here, where the federal district court played no role in voir dire, had no occasion to soak in the "unspoken atmosphere of the trial court," *id.*, and never took stock of the demeanor and body language of the prosecutor and jurors.

Nor is this a case in which the district court reconstructed the *Batson* hearing and following testimony made credibility determinations that affect the disposition of the *Batson* step three inquiry. The majority states that "the magistrate judge did not make—and hence the district court did not reject—any credibility determination." Maj. Op. 23. This view is not precisely accurate as the magistrate judge did credit the prosecutor's testimony—it was just that the prosecutor's testimony didn't have any substance. *Compare with Harris v. Haeberlin*, 752 F.3d 1054, 1061 (6th Cir. 2014) (deferring to federal district court where it made credibility determinations based on newly discovered videotape evidence of voir dire and the prosecutor's live testimony, so

that the case turned on "in-person credibility assessments which clearly the district court is in the best position to make") (internal citation omitted); *Jordan v. Lefevre*, 293 F.3d 587, 594 (2d Cir. 2002) (holding that, once a district court reconstructs a *Batson* hearing in federal habeas proceedings, "we will accord deference to the reconstructing court's credibility assessments").

As a point of stark comparison, a recent Eleventh Circuit case involving a reconstructed *Batson* hearing is instructive. *Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240 (11th Cir. 2014). Significantly, in deferring to the district court, the Eleventh Circuit noted that the district court judge did more than consider "the prosecutor's trial notes and the testimony authenticating it." *Id.* at 1247. The court explained:

> The District Court heard the live testimony of Mr. Madison's trial prosecutor and had the opportunity to observe his demeanor when he offered his explanations for striking the jurors he did. While [the prosecutor] Mr. Cherry relied on his notes to provide his reasons for striking individual jurors, he never testified that he had no recollection of the decisions he made during Mr. Madison's voir dire. In fact, Mr. Cherry was able to answer several questions about his strategy in picking the jury, his awareness of the Mobile County District Attorney Office's history of *Batson* violations, and his experience as a defense attorney. His testimony about these things went beyond the four corners of his voir dire notes.

*Id.* at 1247–48. Because the prosecutor provided substantive testimony and was cross examined by defense counsel, "the District Court was in a superior position to assess [the prosecutor's] credibility and the genuineness of his explanations for striking black jurors at *Batson's* third step." *Id.* at 1248.

Unlike in *Madison*, the prosecutor here testified that he had no recollection of Casey and provided no explanation for striking her that "went beyond the four corners of his voir dire notes." *Id.* The facts are fixed in a cold record, so our *Batson* step three analysis involves nothing more than a run-of-the-mill review of the voir dire records and comparative juror analysis. This case is closely akin to *Welborn*, where the Seventh Circuit concluded that de novo review of the federal district court's *Batson* step three determination was appropriate:

> Although the magistrate judge was able to hear the explanations given by the prosecutors at the *Batson* hearing, she was not in the same position to make credibility determinations as is a trial judge who has the opportunity to observe the responses from the venire and to hear the attorney's explanation for a peremptory immediately after it is exercised. In fact, the prosecutors admitted that at the time of the *Batson* hearing, they had little, if any, recollection of the actual voir dire, and found it necessary to testify with aid from the voir dire transcript and from their contemporaneously taken notes. Therefore since [the magistrate judge, the district judge], and the members of this panel all have

basically been provided with only a cold
record from which to determine if a *Batson*
violation occurred at Holder's jury trial, we
find that no deference is warranted under
these circumstances.

60 F.3d at 388. Likewise, I conclude that no deference to the
federal district court is warranted: the prosecutor had no
recollection of why he struck Casey and the magistrate judge,
the district court, and the Ninth Circuit are all working from
the same decades-old records from voir dire in rendering the
ultimate *Batson* step three determination.

## B. *Batson* Step Three: Purposeful Discrimination

The remaining question is whether, in striking Casey, the
prosecutor had a discriminatory purpose. "'Discriminatory
purpose' . . . implies more than intent as volition or intent as
awareness of consequences. It implies that the decisionmaker
. . . selected . . . a particular course of action at least in part
'because of,' not merely 'in spite of,' its adverse effects upon
an identifiable group." *Hernandez v. New York*, 500 U.S.
352, 360 (1991) (plurality) (quoting *Person. Admin. of Mass.
v. Feeney*, 442 U.S. 256, 279 (1979)). The touchstone, as
described in our caselaw, is whether race was a "substantial
motivating factor" in the prosecutor's decision to strike
Casey. *Cook*, 593 F.3d at 815.

Gleaning the secret truth of the prosecutor's state of mind
is rarely simple, especially years or decades after the trial has
drawn to a close. Our assignment is doubly difficult because
we're missing the key piece of evidence—the prosecutor's
explanation for striking Casey. That testimony is often the
focal point of the step three analysis. However, the

prosecutor should hardly be penalized for his honesty. He merely declined to manufacture a convenient reason post hoc.

I don't begrudge the majority its careful comparative juror analysis. A lot of ink has been spilled in these habeas proceedings now going on 16 years.[5] That so many diligent jurists have reached differing and conflicting conclusions underscores that the prosecutor's notes, while slightly illuminating, are ultimately inconclusive. In my view, the prosecutor's XXXX rating of Casey cannot bear the weight ascribed to it by the majority, nor can a rehashing of the voir dire transcript trump the trial court's factual finding on Casey's demeanor. In proving purposeful discrimination, the "burden of persuasion rests with, and never shifts from," the defendant—Crittenden. *Johnson v. California*, 545 U.S. 162, 171 (2005) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). Whether the standard of review of the district court's phase three determination is clear error or de novo, Crittenden has failed to meet his burden.

---

[5] To recap the tortured procedural history of this case: In January 1999, the magistrate judge issued a Finding and Recommendation ("F&R") stating that the California courts did not unreasonably deny Crittenden's prima facie *Batson* challenge. In May 2002, the district court rejected the F&R and ordered an evidentiary hearing, which was held in December 2002. The magistrate judge concluded that "race played some part in the prosecutor's evaluation of Ms. Casey" but that race was "not the real reason or effective reason for her being stuck from the jury." The district court agreed and denied Crittenden's habeas petition, but the Ninth Circuit reversed in *Crittenden I*. 624 F.3d at 959–60. On remand, the magistrate's third F&R recommended that although the prosecutor's racial motivation in striking Casey was "significant," it was "not substantial" and again recommended denial of the *Batson* claim. The district court rejected that conclusion and found that the "prosecutor was motivated, consciously or unconsciously, in substantial part by race" and therefore granted Crittenden's petition. This appeal followed.

To begin, the prosecutor testified that Xs meant a venire member was "opposed to the death penalty and strongly stated it . . . Checkmarks were people who either were for the death penalty or medium ground that I thought to some degree I would be able to tolerate having on the jury." The more Xs the juror received, the less favorably the prosecutor viewed that juror; the more checkmarks, vice versa. The prosecutor made the ratings after reviewing the written juror questionnaires and listening to the voir dire answers of each member of the venire.

By the time Casey entered the jury box, the prosecutor already had used peremptories against seven of the nine venire members to whom he gave a negative rating of at least one X. The prosecutor did not strike Casey at the first opportunity upon her draw to the jury box; instead, he removed a juror with a "✓?" rating. He then struck Casey. When the prosecutor did so, the jury box included the following venire members, as rated by the prosecutor:

- Corrao—✓✓✓
- Casey—XXXX
- Fisher—✓
- Rehm—✓
- Tennies—✓✓
- Naess—✓
- Bertrando—XXX
- Shalley—✓
- McMahan—✓✓✓
- Stewart—(no rating but listed as one of the "good jurors" by the prosecutor; she was later excused for hardship).
- Fortier—✓✓✓
- Curtis—✓✓✓

Facing a potential jury in which a majority held neutral or favorable views toward the death penalty, the prosecutor did what anyone would expect: he struck Casey and then Bertrando, who stated on his juror questionnaire that "killing people isn't right no matter who is doing it" and that life imprisonment actually is a "worse punishment." Having removed every juror with at least an X rating, the prosecutor used his remaining peremptories against those with a ✓ or ✓✓? rating. The jury ultimately was comprised exclusively of jurors with at least a ✓✓ rating; all but two scored even higher.

As I described earlier, *see* Section I, the prosecutor used his first 14 peremptories against white jurors, many of whom expressed less doubt about the death penalty than did Casey. The upshot is that, by the time Casey was seated in the jury box, the prosecutor already had removed most of the jurors he considered unfavorable to the case for capital punishment— even those whose death penalty views bent more toward ambivalence than opposition. Leaping to racism as the substantial explanation for the strike against Casey ignores the obvious, because Casey and Bertrando fell right in line with the prosecutor's pattern of previous strikes. Overall, the prosecutor used 21 of his 26 peremptories against venire members who opposed the death penalty in some fashion. As the magistrate judge noted, Casey "would have been stricken regardless of her race."

Nor is Casey the only juror who received the XXXX rating. The prosecutor also gave Smith, who was white, the same rating, so race is hardly the only reason for the fourth X. The majority says that Smith was more deserving of the XXXX rating because she "arguably expressed stronger opposition to the death penalty than did Casey." But it takes

no leap of logic to conclude the opposite, as the magistrate judge did: "Arguably, this four 'X' juror was more disposed to render a death verdict than Mrs. Casey." As one example, the prosecutor asked Smith whether her views would impair her ability to fairly and impartially consider the evidence in favor of the death penalty. Smith's response: "I don't think so. I think that there are circumstances where I would be able to agree with the death penalty." When the prosecutor asked Casey the nearly word-for-word identical question, her answer came with a heavy dose of hesitation: "I can't say yes. I can't say no. I really don't—don't know."

Smith had a negative run-in with law enforcement, when her husband apparently was falsely identified by a witness to a crime, and described the prospect of jury service as "horrifying" and "frightening." But in a similar vein, Casey found the idea of capital jury service "scary" and was "very upset about it." Although Smith used stronger adjectives, both potential jurors exhibited a demeanor poorly suited to sentencing someone to death, setting them apart from others in the jury pool who were ideologically opposed to capital punishment.

The majority emphasizes that Casey's substantive death penalty answers alone did not warrant the XXXX rating, but this view obscures what the trial court said about Casey—that "she is indecisive" and "couldn't decide whether or not she would be able to follow the law." Unlike the array of appellate and federal judges to weigh in over the 26 years since Crittenden's conviction, the trial judge was there. He supervised voir dire, personally questioned Casey, and took notes on her answers and demeanor. We shouldn't lightly disregard his impressions. *See, e.g.*, § 2254(e)(1); *Cook*, 593 F.3d at 816 ("[W]e must defer to the trial judge's

findings regarding the demeanor of the individuals in the courtroom.").

The voir dire transcript confirms Casey's apparent angst and anguish. Asked about the prospect of serving on the jury, she replied: "Not good," and explained: "It is scary." Later, when asked whether she could be open and objective about whether to impose the death penalty, Casey equivocated: "I can't say fully. I would try." She continued, "I can't sit here and really say for sure if I could . . . I have to say I think I could. This is all new to me. So I am very upset with it." She agreed with the prosecutor that she'd have difficulty reaching a decision on the death penalty. Her testimony cannot be characterized as coming to a concrete, definitive willingness to vote for the death penalty. The prosecutor came away with the same impression—writing "[c]an't say if would set aside" on Casey's juror sheet.

The trial judge's factual finding that Casey was indecisive separates her from juror Clark, who described herself as a "pretty decisive person" who makes big decisions without guilt or self-doubt. Significantly, Clark also articulated a distinctly law-and-order outlook. In prior jury service, Clark had voted to convict a criminal defendant of drunk driving and said she was "really disturbed" by a holdout juror who wanted to acquit because that juror "hated cops. It was very disturbing to me." When defense counsel asked Clark whether she "believed in law enforcement," she responded, "I certainly do." She later added: "I feel very strongly that people should be punished for what they do. I feel very strongly about the law." Not surprisingly, the prosecutor's notations say that, aside from her death penalty views, Clark was an "[o]therwise *strong*" prosecution juror. By contrast, Casey had never served on a jury, made no similar pro-police

statements, and can fairly be described as tentative in her answers.

The majority's focus on potential jurors Sullivan and Tennies is also misplaced. Maj. Op. 32–35. The prosecutor used peremptories on both of them *after* having struck Casey. Comparative juror analysis is supposed to comprise "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). Sullivan and Tennies were not "allowed to serve," so any comparison between them and Casey is not illuminating. In other words, that the prosecutor struck Casey, Sullivan, and Tennies—all of whom expressed varying degrees of hesitancy about the death penalty—does nothing to prove racial bias.[6]

With the evidence stacked against the proposition that race was the real reason for striking Casey, the district court concluded that Crittenden has met his burden under *Batson* by showing that the prosecutor was motivated at minimum by *unconscious* bias. Although I am very sympathetic to the notion of unconscious bias—stealth bias is destructive and

---

[6] The majority cites Sullivan and Tennies as proof that anti-death penalty views were not determinative, because they both expressed some hesitation about the death penalty yet received ✓✓ ratings. This overreads the significance of the rating notations, elevating them to scientific certainty and excluding evaluation of the jurors' other characteristics. The four-month voir dire featured extensive questioning on the death penalty from the judge, prosecutor, and defense counsel. The prosecutor used 21 of his 26 peremptories against jurors who opposed the death penalty, including Sullivan and Tennies. The magistrate noted that a review of the "entire voir dire transcript" shows that "for the most part" the proceedings "focused on the death penalty . . . ." Just because the prosecutor didn't view all jurors who expressed anti-death penalty sentiments as exactly the same hardly shows that the entire enterprise was a sham.

real, even though it is often difficult to document—it is not an easy fit within the *Batson* framework, which focuses on the *purpose* of the prosecutor rather than the subconscious social and cultural factors that influence decisionmaking.[7]   The Supreme Court has never endorsed the view that unconscious bias can form the basis for a *Batson* challenge.[8]   The only circuit court to address the issue held that "evidence of 'subconscious' discrimination is not relevant" to purposeful discrimination under *Batson*.   *United States v. Roebke*, 333 F.3d 911, 913 (8th Cir. 2003).

The majority puts a wishful spin on the district court's decision.  Maj. Op. 40–41.  To recap: the district court held that the prosecutor "was motivated, consciously or unconsciously, in substantial part by race" and granted

---

[7] To be sure, *Batson*'s requirement of purposeful discrimination does not lack for critics.  Recently, for example, the Washington Supreme Court bluntly declared that "*Batson* is . . . failing us," because modern-day racism isn't overt but is embodied in "stereotypes that are ingrained and often unconscious."  *State v. Saintcalle*, 309 P.3d 326, 334–36 (Wash. 2013) (en banc).   "Unconscious stereotyping upends the *Batson* framework," which is "only equipped to root out '*purposeful*' discrimination, which many trial courts probably understand to mean conscious discrimination."  *Id.* at 336.

[8] Two Supreme Court justices have referenced unconscious or subconscious bias in the *Batson* context.  In *Batson* itself, Justice Marshall concurred to warn that "trial courts are ill equipped to second-guess" facially neutral reasons offered by prosecutors, who may not be conscious of their own bias.  476 U.S. at 105, 106 (Marshall, J., concurring).  In *Miller-El*, Justice Breyer echoed Justice Marshall's views and cited evidence that, despite *Batson*, widespread racial discrimination in jury selection has persisted.  545 U.S. at 267–68 (Breyer, J., concurring).  Both concurrences pointed out *shortcomings* with the *Batson* framework and advocated eliminating peremptories altogether; neither is a binding pronouncement of *Batson* law.

Crittenden's habeas petition. Upon the government's motion for a stay pending appeal, the district court left its earlier decision intact and added some interpretive gloss that it meant to "leave[] no doubt that it concluded [the prosecutor's] strike of Casey was purposeful discrimination." However, the district court went on to reiterate that it couldn't say "why [the prosecutor] was motivated by race"—i.e., whether "by conscious or unconscious racism," so the court hardly disavowed its unconscious racism theory. In any event, the district court did not retract or amend its order granting the writ, which is the order under review on appeal.

In sum, Crittenden has not shown that the prosecutor's strike was motivated by purposeful discrimination. The record simply does not support the conclusion that reference to Casey's demeanor and death penalty views were pretext for racial bias. In a case such as this, we should be especially wary of overreading isolated snippets of a voluminous voir dire transcript. As the Supreme Court recently reminded, in capital cases jurors often will express varying degrees of hesitancy about imposing the death penalty. *Ayala*, 135 S. Ct. at 2201. Both prosecution and defense must make "fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment. These judgment calls may involve a comparison of responses that differ in only nuanced respects, as well as a sensitive assessment of jurors' demeanor." *Id.* Prosecutors must act on instinct; they don't have the hindsight-laden benefit of a leisurely review of a complete transcript. The prosecutor's actions here fit well within that band of discretion, so far as the cold record reveals.

This case calls to mind Justice Breyer's observation that the *Batson* inquiry can be an "awkward, sometime hopeless,

task of second-guessing a prosecutor's instinctive judgment—the underlying basis for which may be invisible even to the prosecutor exercising the challenge." *Miller-El*, 545 U.S. at 267–68 (Breyer, J., concurring). In view of the record of what actually happened, the trial judge's findings and the ultimate composition of the jury, our retrospective parsing simply cannot elevate ambiguous, speculative foundation to proof that the prosecutor was motivated in substantial part by racism.

I respectfully dissent.